Andrew RAMOS, Jesus Trinidad, Jr. and Bruno Martinez, Plaintiffs-Appellants,

v.

Alfred H. KOEBIG et al., Defendants-Appellees.

No. 79–2316.

United States Court of Appeals, Fifth Circuit.
Unit A

March 5, 1981.

Rehearing and Rehearing En Banc Denied April 2, 1981.

---

12. *Id.*

Joaquin G. Avila, San Antonio, Tex., for plaintiffs-appellants.

Ralph Keehn, Seguin, Tex., Foster, Lewis, Langley, Gardner & Banack, Emerson Banack, Jr., San Antonio, Tex., for defendants-appellees.

Before GOLDBERG, POLITZ and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

This appeal involves the recurring issues of distinguishing between legislative and court-ordered reapportionment plans, determining the procedures to be undertaken by a district court following judicial invalidation of a prior plan, and determining when a plan enacted in response to judicial invalidation of a prior plan is subject to the preclearance requirements of section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c. After considering plans submitted both by plaintiffs and the City Council, the district court approved the Council's plan without modification, and ordered the Council to conduct elections under the plan. The district court also denied plaintiffs' motion for attorneys' fees under the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988. For the reasons that follow, the judgment of the district court is reversed, and the case remanded for further proceedings consistent herewith.

## I.

The City of Seguin, Texas, is governed by a City Council, which consists of eight members and a mayor. The mayor is elected at-large and the eight councilmen are elected from four wards. According to the 1970 census, the City's population is approximately 15,934 persons, of which approximately 6,378 or 40.02 percent are Mexican-American and 2,337 or 14.67 percent are black. Although the two minority populations constitute approximately 54.69 percent of the City's total number, the minority community has never been able to elect more than two representatives, or one-fourth of the council, at any one time.

Efforts to redistrict the City's ward system preceded this lawsuit. In 1976, the City Council redistricted the boundaries of two wards. The plan, which was designed to replace the then-existing 1962 plan, was submitted to the United States Attorney General pursuant to section 5 of the Voting Rights Act. The plan was withdrawn from the preclearance process, however, and the 1977 Council elections were held under the 1962 plan.

After the 1977 election, City officials met with County officials for the purpose of making adjustments in the voting precinct boundaries. When it appeared that these adjustments would not become effective in time for the 1978 municipal elections, plaintiffs filed suit on February 17, 1978, to enjoin the Council and City Secretary from conducting the 1978 elections under the 1962 plan.

Because the 1962 plan contained a total population deviation between the most populated and least populated ward of 109 percent, the Council did not contest the unconstitutionality of the plan. On March 15, 1978, shortly after the complaint was filed, the district court entered an order, upon the joint motion of plaintiffs and defendants, enjoining the use of the 1962 plan for the April 1, 1978, municipal elections. As a result of the injunction, the 1978 scheduled election was not held.

On April 3, 1979, the district court conducted a hearing, at which both plaintiffs and the Council presented redistricting plans. The Council's proposal was presented through the testimony of its expert, who was responsible for formulating the plan. The Council also presented the testimony of

the mayor and a councilman. Both supported the Council's proposal, and although acknowledging that plaintiffs' proposal would provide greater minority participation in the City Council, expressed the opinion that the Council's plan was better overall.

Plaintiffs presented two proposals through the testimony of one of the plaintiffs, Jesus Trinidad. Trinidad testified that, whereas the Council's plan would perpetuate an historical dilution of minority voting strength, plaintiffs' plans would ensure minority participation in the municipal political machinery.

On April 13, 1979, after examining the evidence presented, the district court adopted without modification the Council's plan as "the official ward boundaries of the City of Seguin, Texas," and ordered the Council to divide the city into wards and conduct elections according to the plan. On the issue of plaintiffs' prayer for an award of attorneys' fees, the district court determined that an award was not justified because the Council was attempting to remedy the Constitutional violation at the time the lawsuit was filed, and because the district court adopted the Council's, rather than plaintiffs', plan.

When it became apparent that the Council did not intend to submit the plan for federal preclearance under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, plaintiffs in *Trinidad v. Koebig*, No. 79–2750, 638 F.2d 846 (1981), also decided this day, brought an enforcement proceeding to compel preclearance, and to prevent the City from conducting the election scheduled for August 11, 1979, until preclearance had been obtained. The district court in *Trinidad* held that the plan approved in the case *sub judice* was a court-ordered, rather than a legislatively enacted plan, and therefore was exempt from the section 5 process. *See Connor v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). Consequently, the district court dismissed plaintiffs' suit, and the 1979 election was held as scheduled.

In the case *sub judice*, plaintiffs argue that the plan submitted by the Council and approved by the district court dilutes minority voting strength, and therefore violates the strict standards applicable to court-ordered plans. Plaintiffs also complain that the district court erred in refusing to award attorneys' fees under the Civil Rights Attorneys' Fees Awards Act of 1976. Alternatively, plaintiffs in *Trinidad* argue that the plan is a legislative, or court-approved plan, rather than a court-ordered plan, and that the district court therefore erred in passing upon its constitutionality without first requiring the Council to enact the plan and obtain section 5 preclearance under the Voting Rights Act. Because of the interrelated nature of both cases, and the divergent standards applicable to legislatively enacted and court ordered plans, we proceed first to a determination of which standards are applicable to the plan in the case *sub judice*.

II.

In *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), the Supreme Court held that court-ordered reapportionment plans resulting from a federal court's equitable jurisdiction are not subject to section 5 of the Voting Rights Act. In rejecting the Government's argument that the section 5 preclearance procedures must be complied with prior to adoption by a federal district court of a reapportionment plan submitted to it on behalf of local legislative body that is subject to the Act, the Court stated that "[h]ad the ... police jury reapportioned itself on its own authority, clearance under § 5 of the Voting Rights Act would clearly have been required," *citing Connor v. Waller*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975). The Court, however, concluded that the plan submitted to the district court in *East Carroll* was not such a "legislative" plan because (1) the police jury did not purport to apportion itself, but merely submitted a proposed plan to the district court; and (2) the police jury did not have the legislative authority to apportion itself, because the enabling legislation had been in-

validated by the Attorney General of the United States pursuant to section 5. The Court concluded that "[s]ince the reapportionment scheme was submitted and adopted pursuant to court order, the preclearance procedures of § 5 do not apply," *citing Connor v. Johnson*, 402 U.S. 690, 691, 91 S.Ct. 1760, 1761, 29 L.Ed.2d 268 (1971).

Two years later, in *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), the Supreme Court had occasion to readdress the principles applicable to distinguishing between legislative and court-ordered plans. In that case, after declaring the existing at-large system of electing the City Council of Dallas, Texas, to be unconstitutional, the district court afforded the Council an opportunity to prepare an acceptable plan. After passing a resolution which stated that the City Council intended to enact an ordinance to adopt a new plan, the Council submitted the new plan to the district court for approval. Following an evidentiary hearing, the court announced in an oral opinion that the Council's plan was acceptable. Two days later, the Council enacted an ordinance adopting the plan, and the district court subsequently issued a memorandum opinion again sustaining the Council's plan as a valid legislative act. On appeal, this Court reversed, and held that the district court erred in evaluating the Council's actions only under constitutional standards, and neglecting to apply the stricter standards required by *East Carroll* and prior cases for court-ordered plans.

The Supreme Court reversed. In an opinion joined in by Justice Stewart, Justice White distinguished *East Carroll* from *Wise* on three grounds. First, the district court in *Wise* reviewed the plan as a legislative plan, whereas in *East Carroll* the local bodies submitted plans in response to court orders and did not purport to reapportion themselves. Second, state law prevented the bodies in *East Carroll* from reapportioning themselves; the enabling legislation had been disapproved by the Attorney General under section 5 of the Voting Rights Act. Finally, the district court in *Wise* explicitly gave the City Council an opportunity to devise a constitutional apportionment.

In an opinion joined in by Chief Justice Burger and Justices Blackmun and Rehnquist, Justice Powell concurred with Justice White's opinion, but took a different approach. Whereas Justice White placed primary emphasis upon the fact that, unlike the governmental bodies in *East Carroll*, the Dallas City Council was precluded neither by the Voting Rights Act nor by Texas law from reapportioning itself, Justice Powell opined that

> The essential point is that the Dallas City Council exercised a legislative judgment, reflecting the policy choices of the elected representatives of the people, rather than the remedial directive of a federal court.

437 U.S. at 548, 98 S.Ct. at 2501. Relying upon *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), Justice Powell also emphasized that "[t]his rule of deference to local legislative judgments remains in force even if, as in *Burns*, our examination of state law suggests that the local body lacks authority to reapportion itself." *Id.* In an effort to distinguish *East Carroll*, Justice Powell noted in his concurrence that the Attorney General's invalidation of the enabling legislation "tainted" the legislative judgments reflected in the governing bodies' plans in that case.

Joined by Justices Brennan and Stevens, dissenting, Justice Marshall agreed with the approach taken by Justice White, but reached different factual conclusions. Justice Marshall found no meaningful distinction between the facts of *East Carroll* and *Wise*: In neither case did the legislative body follow valid state procedures governing the reapportionment process; moreover, neither legislative body purported to effect a binding reapportionment. Consequently, in Justice Marshall's view, the plan was subject to the strict rules applicable to court-ordered plans.

Comparison of the facts in the present case with those in *East Carroll* and *Wise* provides little guidance. In the case *sub judice*, both parties submitted plans to the district court, which approved the Council's

plan without modification, and ordered the Council to enact the plan. By considering plans proposed by both parties, and by not affording the legislative body an opportunity first to reapportion itself, the district court followed a procedure similar to that used in *East Carroll*. That no such opportunity was explicitly given, and that the Seguin City Council did not purport to reapportion itself before submitting the plan for the court's approval, also distinguishes the present case from *Wise*. Consequently, under the approach taken by Justices White in *Wise*, these factors would suggest that the plan adopted by the district court in the present case is more closely akin to a court-ordered plan. 437 U.S. at 545–46, 98 S.Ct. at 2499–2500.

Conversely, under Justice Powell's approach, the essential inquiry focuses not upon the *method* by which the plan is enacted, but rather upon the *source* of the plan. Because the Seguin City Council's plan was devised not by the court, but by the legislative body charged with that responsibility, and therefore reflects a legislative judgment of the elected representatives, the plan would be reviewed under the standards applicable to legislative, rather than court-ordered plans.[1] That the Council did not expressly enact the ordinance prior to submitting it to the district court would not be controlling. Moreover, unlike *East Carroll*, the legislation enabling the Seguin City Council to reapportion itself had not been disapproved by the Attorney General pursuant to the Voting Rights Act; consequently, the legislative judgment of that body cannot be said to have been "tainted."[2]

From the foregoing, it might be supposed that any attempt to determine whether the plan submitted for approval by the Seguin City Council is a legislative plan or is a court-ordered plan necessarily would involve an election between the approaches taken in the various opinions in *Wise*.[3] We believe, however, that this approach is not appropriate in the case *sub judice*. Rather, we base our decision upon well established principles governing the proper role of a district court in the reapportionment process, and the procedures appropriate in those circumstances.

 Notwithstanding the sharply drawn differences evident in the various opinions in *Wise*, one area of common ground is apparent, and rests upon established precedent: The business of redistricting and reapportioning legislative bodies is a legislative function "which the federal courts should make every effort not to preempt." 98 S.Ct. at 2497, *citing Connor v. Finch*, 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–1834, 52 L.Ed.2d 465 (1977); *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975); *Gaffney v. Cummings*, 412 U.S. 735, 749, 93 S.Ct. 2321, 2329, 37 L.Ed.2d 298 (1973); *Burns v. Richardson*, 384 U.S. 73, 84–85, 86 S.Ct. 1286, 1292–1293, 16 L.Ed.2d 376 (1966). Equally clear is the principle that

> [w]hen a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.

437 U.S. at 539, 98 S.Ct. at 2497. As the above-quoted passage suggests, circumstances will arise when, because of the imminence of upcoming elections or some other exigency, a district court will be required to order into effect its own plan. Similarly,

---

1. The Council retained an expert to prepare its proposal. The expert, however, received instructions from the Council as to the factors to be considered in preparing the plan.

2. It is interesting to note, however, that inasmuch as Texas is subject to the Voting Rights Act, and all changes affecting voting must receive preclearance before they will become effective as law, it could be said *any* legislative judgment that affects voting would be so "tainted."

3. The Supreme Court has recently agreed to readdress the issue. *See Sanchez v. McDaniel*, 615 F.2d 1023 (5th Cir. 1980), *cert. granted, —— U.S. ——, 101 S.Ct. 265, 66 L.Ed.2d 127 (1980).

844

when the governmental body is unable or unwilling to fulfill its legislative duties, it will become the "unwelcome obligation," *Connor v. Finch*, 431 U.S. at 415, 97 S.Ct. at 1834, of the court to devise and impose a plan. Such a court-ordered plan will be a temporary measure, however, and will not preclude the legislative body from devising a plan that reflects its legislative judgment. Once validly enacted, and approved by the district court on constitutional grounds, the legislative plan will become effective, and will supersede the temporary court-ordered plan.

■■■■■ The peculiar effects of section 5 of the Voting Rights Act also may require a court to impose a temporary, court-ordered plan. As the Court recognized in *Wise*:

A new reapportionment plan enacted by a State, including one purportedly adopted in response to invalidation of the prior plan by a federal court, will not be considered "effective as law," *Connor v. Finch, supra*, 431 U.S., at 412, 97 S.Ct. at 1832; *Connor v. Waller*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975), until it has been submitted and has received clearance under § 5. Neither, in those circumstances, until clearance has been obtained, should a court address the constitutionality of the new measure. *Connor v. Finch, supra; Connor v. Waller, supra*. Pending such submission and clearance, if a State's electoral processes are not to be completely frustrated, federal courts will at times necessarily be drawn further into the reapportionment process and required to devise and implement their own plans.

4. The district court in *Wise* did not require the Dallas City Council to obtain section 5 preclearance before approving the plan on constitutional grounds, because Texas was not subject to the Voting Rights Act when *Wise* was pending before the district court. 98 S.Ct. at 2493. Consequently, the Supreme Court did not reach the section 5 issue. In *Heggins v. City of Dallas, Texas*, 469 F.Supp. 739 (N.D. Tex. 1979), a federal district court determined that the Dallas plan was subject to federal preclearance.

5. In choosing this approach, this Court finds it unnecessary to elect among the various posi-

437 U.S. at 542, 98 S.Ct. 2498.[4] In the case *sub judice*, the district court did not afford the Seguin City Council an opportunity to enact a valid legislative plan; rather, it immediately conducted a remedy hearing at which both sides submitted plans. The district court thereupon adopted the plan submitted by the City as its own. Nothing in the district court's opinion, and nothing in the record, however, suggests that the Council was unwilling or unable to enact a plan, or that the imminence of city elections, or some other exigency, required the court to impose a plan.

Indeed, the record suggests no reason why the district court could not have devised a temporary court-ordered plan for the purpose of allowing the 1978 election to go forward, although perhaps not on the scheduled April 1 date. Instead, the March 15, 1978 injunction remained in effect, and no election was held until August 11, 1979. As the above-quoted passage indicates, the clear teaching of *Wise* and cases cited therein is that, during the period of time necessary for the appropriate legislative body to enact a valid reapportionment, the use of temporary court-ordered plans may be necessary to ensure that the "electoral processes are not . . . completely frustrated . . ." 437 U.S. at 542, 98 S.Ct. at 2498.[5] Consequently, we hold that the district court erred in passing upon the constitutionality of the plan before affording the City Council an opportunity to follow the procedures necessary to enact a valid legislative plan, including compliance with the preclearance requirements under section 5 of the Voting Rights Act.[6]

tions adopted by the Justices in *Wise*, nor do we attempt to determine whether the facts of the case *sub judice* are closer to those of *Wise* or *East Carroll*. It should be noted, however, that the principles upon which this Court's opinion rests are of long standing, and received unanimous reaffirmance in *Wise*, 98 S.Ct. at 2497–98.

6. In so holding, we need not reach the question of whether the plan approved by the district court in this case satisfies the strict standards applicable to court-ordered reapportionment plans.

On remand, the district court should refrain from passing upon the constitutionality of the plan until the Council has had a reasonable opportunity to obtain preclearance. Should the Council be unable to obtain preclearance, or should some other exigency, such as an intervening election, arise, the court will be required to devise and impose a temporary plan in accordance with the strict standards generally applicable thereto.

### III.

The only remaining issue is the district court's refusal to award attorneys' fees to plaintiffs under the Civil Rights Attorneys' Fees Awards Act of 1976. The district court denied any award upon the grounds that (1) at the time plaintiffs filed suit, the Council was attempting to devise a new plan, and (2) the district court adopted the Council's plan, rather than plaintiffs' plan.

■■ In support of the district court's decision, the Council first argues that plaintiffs were not prevailing parties within the meaning of the Awards Act because the Council admitted the unconstitutionality of the 1962 plan and agreed to the injunction, and that the only disputed issue—whether the Council's plan or plaintiffs' plan was preferable—was decided in favor of the Council. This argument cannot be sustained. As a result of plaintiffs' suit, the Council admitted the unconstitutionality of the plan, and the district court issued an injunction prohibiting the City from holding elections under the 1962 plan. As a direct result of plaintiffs' suit, therefore, the City was prohibited from conducting the 1978 election under the unconstitutional plan. That the Council was in good faith is of no consequence. *Brown v. Culpepper*, 559 F.2d 274 (5th Cir. 1977). Similarly, that the district court rejected plaintiffs' plan, and adopted the Council's plan likewise is irrelevant. A prevailing party need not have prevailed on all issues; it is sufficient that plaintiffs prevail on the main issue. *Irani-*

*an Students Association v. Edwards*, 604 F.2d 352, 353 (5th Cir. 1979). In the present case, the principal relief prayed for in plaintiffs' complaint was for an injunction against any future elections under the unconstitutional 1962 plan—precisely the relief ordered by the district court. Consequently, plaintiffs are "prevailing parties" within the meaning of the Awards Act. 604 F.2d at 353–54. That the Council admitted the unconstitutionality of the 1962 plan, and consented to entry of the injunction, does not change this result. *Id.*

Alternatively, the Council argues that even if plaintiffs are prevailing parties, the "special circumstances" of this case would render an award of attorneys' fees "unjust." *See Criterion Club of Albany v. Board of Commissioners*, 594 F.2d 118 (5th Cir. 1978). As "special circumstances," the Council relies upon the fact that, at the time plaintiffs filed suit on February 17, 1978, the Council was attempting to devise a new plan.

■ In *Riddell v. National Democratic Party*, 624 F.2d 539 (5th Cir. 1980), this Court surveyed the decision of other courts applying the "special circumstances" exception, and noted that several courts have refused to award attorneys' fees when, even though the plaintiffs received the benefits desired from their litigation, their efforts did not contribute to achieving those results. *See* 624 F.2d at 544–45 and cases cited therein. Without expressing an opinion on the correctness of those decisions, it is clear that the rationale upon which they were decided is not present in this case.

At no time in this litigation has the Council argued that, absent plaintiffs' lawsuit and the March 15, 1978, injunction that resulted therefrom, the Council would have devised and obtained preclearance for a new plan in time for the election scheduled for April 1, 1978. Indeed, examination of Defendants' Answer reveals that the Council has asserted the contrary.[7] By its own

---

**7.** In its Answer, the Council explained that, following an unsuccessful attempt to secure preclearance of a plan in time for the 1977 municipal elections, the committee charged with realigning the City ward lines discovered Article 2.04(c) of the Texas Election Code,

admission, the Council's efforts to devise and implement a new plan would not bear fruit until 1979, long after the April 1, 1978 elections.

Finally, the Council argues that to award attorneys' fees in these circumstances would unfairly penalize governmental bodies in the process of attempting to bring their election machinery up to constitutional standards by allowing a private party to recover attorneys' fees simply by filing suit. This Court is sensitive to the Council's concern. As noted *supra*, however, this is not a case in which plaintiffs' suit failed to contribute to achieving the relief prayed for. It is beyond peradventure that the central purpose underlying the Voting Rights Act was to shift the burden of inertia on the perpetrators of voting discrimination by imposing a duty upon affected states voluntarily to submit any new law affecting voting for federal preclearance *prior* to its enforcement. *See Berry v. Doles*, 438 U.S. 190, 195, 98 S.Ct. 2692, 2695, 57 L.Ed.2d 693 (1978) (Brennan, J., concurring). To deny a successful plaintiff attorneys' fees in these circumstances would do violence to the remedial spirit of both the Voting Rights Act and the Awards Act. Consequently, the district court erred in denying plaintiffs' motion for attorneys' fees. On remand, the district court should award fees in conformity with the guidelines established in *Johnson v. Georgia Highway Express Co., Inc.*, 488 F.2d 714 (5th Cir. 1974).

REVERSED AND REMANDED.

which provided in part that "[i]n cities [over 10,000 population], no [county] precinct shall be made out of parts of two [city] wards." Thereupon

[o]n November 7th, 1977, the Mayor of the City of Seguin and the City's Attorney met with the Guadalupe County Commissioners Court, and all agreed that (a) the City would work out its ward lines; (b) present them to the Commissioners Court; (c) the Commissioners Court prior to October 1st, 1978 would arrange their precincts' lines to agree with the City's ward lines; and (d) the re-arranged ward lines would be effective during 1979 after approval by the United States Justice Department.