**Regionald SEASTRUNK, et al.,
Plaintiffs-Appellants,**

v.

**Gerald BURNS, et al.,
Defendants-Appellees.**

**No. 84–4207.**

United States Court of Appeals,
Fifth Circuit.

Sept. 30, 1985.

the chemist), we do not believe that it was material to the magistrate's finding of probable cause.

Louis Berry, Alexandria, La., for plaintiffs-appellants.

James Brady, Alexandria, La., for Vernon Parish School Bd.

Before BROWN, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from the district court's approval of a reapportionment plan adopted by the Vernon Parish, Louisiana School Board. Appellants, black residents of the Parish, alleged that the plan violated their rights under the Fourteenth and Fifteenth Amendments of the United States Constitution, and did not meet the standards required by the Voting Rights Act, 42 U.S.C. § 1973, as amended in 1982. The district court determined that it had not been shown that the School Board's plan violated appellants' rights under the Constitution, or failed to meet Voting Rights Act standards, and that accordingly the decision of the School Board, as the proper legislative body to promulgate the reapportionment plan, was entitled to deference and should be sustained. We affirm.

## FACTS AND PROCEEDINGS BELOW

Vernon Parish (the "Parish") is a rural parish in western Louisiana, with a total population of 38,897, excluding Fort Polk military personnel. The population is 85 percent white, 12.4 percent black, and 2.6 percent other races. The majority of the black population is concentrated in a relatively small geographic region in and around the town of Leesville near the center of the Parish. Prior to the bringing of this suit, no black had been elected to the School Board under the existing twelve-member scheme.

Each Louisiana parish school board is authorized by state law to reapportion itself, as long as each board member as nearly as possible represents the same number of persons. La.–R.S. 17:71.1.[1] In so doing, the board "may create such special school board election districts as it deems desirable" and these districts "need not be coterminous with the wards that may be created by any governing authority...." La.–R.S. 17:71.3 (1982).[2] The districts may be single-member or multi-member. *Id.* Reapportionment may occur every decennial year. La.–R.S. 17:71.5.[3]

Pursuant to this authority, the Vernon Parish School Board (the "Board") in

---

1. La.–R.S. 17:71.1 reads, in pertinent part:

   "Each of the parish and city school boards ... is hereby authorized to reapportion itself so that each member of said board represents as nearly as possible the same number of persons. Such reapportionment shall be based upon the 1970 federal census, or a special census as authorized hereinafter, and shall be accomplished and become effective when a school board has complied with the provisions of R.S. 17:71.4 [providing for board resolution establishing size of board, terms of office, election dates, boundary lines, etc.]."

2. La.–R.S. 17:71.3 sets out the procedure a board may use to accomplish reapportionment. In pertinent part, it provides:

   "A. Each of the parish and city school boards shall use the federal census of 1970 as the basis upon which to accomplish reapportionment, provided however, that each of said school boards may authorize the taking of a special census to use as a basis for reapportionment. To this end, each of said school boards may employ qualified firms to take such special census, and may employ such other consultants, attorneys, etc. as it deems desirable in order to assist such board in such reapportionment.

   "B. Each of said boards, after determining the number of members of said board after reapportionment is to be effective, may create such special school board election districts as it deems desirable. These districts need not be coterminous with the wards that may be created by any governing authority, but any such special school board election districts created as a result of this Subpart shall be compact and contiguous.... The board may provide that all or part of its members shall be elected from such districts and may provide that one or more of its members may be elected at large from each of such districts." (As amended in 1982, and effective July 22, 1982. [West Supp.1985])

   The precursor to section B, which might arguably apply to the initial plan proposed by the Board, provided in substance for the same possibilities of district geography and Board membership.

3. La.–R.S. 17:71.5 provides:

   "Each of said boards is authorized to again reapportion itself as set forth herein, based upon the census taken in 1980, and each of such boards is authorized to again reapportion itself every ten-year decennial thereafter, such reapportionment to be effective in time for the elections in the second year thereafter. No school board shall reapportion itself more often than every ten years."

March 1982 determined to reapportion itself.[4] The Board hired Tri-S Associates, Inc., of Ruston, Louisiana ("Tri-S"), to act as consultants and to draw the proposed Board plan.[5] Following preliminary work by Tri-S and discussions of the prospective reapportionment at several open meetings of the Board, which were attended by at least some of the appellants, on April 12, 1984, the Board adopted a plan calling for thirteen members from seven electoral districts. Four districts were single member; the remaining three were multi-member districts. One single-member district in the northwest Leesville area, denominated district 1–D, had a 90 percent black population. This plan replaced the existing twelve-member "mixed" (i.e., some single-member and some multi-member districts) plan. The new plan was forwarded to the Justice Department for preclearance as required by section 5 of the Voting Rights Act. 42 U.S.C. § 1973c. On October 5, 1982, the Justice Department informed the Board by letter that it would not object to the plan.

Elections for Board members under the new plan were set for March 26, 1983 (primary election) and April 30, 1983 (general election). The candidate qualifying period was set for January 24–28, 1983. Shortly before the qualifying period was to begin, appellants, all black residents of Vernon Parish, at least some of whom are members of the local Political Action League ("PAL"), brought suit seeking an injunction to prohibit the qualifying of candidates and the holding of an election, alleging that their rights under the Fourteenth and Fifteenth Amendments of the United States Constitution had been violated by the adopted plan. Appellants also alleged that the plan failed to meet the standards set out in the Voting Rights Act, 42 U.S.C. § 1973 et seq., as amended in 1982.

On January 13, 1983, the district court entered a rule nisi enjoining the Board from holding the elections as scheduled, and ordering appellees to show cause why a preliminary injunction should not issue. On January 19, 1983, by consent of the parties, the court held a hearing on the merits.

Kenneth Selle, president of Tri-S, who worked on the plan for the Board, testified as an expert at the hearing. Selle testified that he received somewhat cursory instructions indicating the Board's concern that reapportionment was necessary because of population shifts within the district. He was instructed to take into account the requirements of the Constitution, the Voting Rights Act, and the Justice Department's current preclearance screening requirements, and to draw an acceptable plan. In accord with Selle's experience, he recommended that the new plan should as closely as possible track the basic apportionment geography of the existing scheme,[6] while also satisfying current state and federal voting law requirements.

Using detailed 1980 census data, Selle determined the total population of the Parish to be 38,897, excluding the military personnel stationed at Fort Polk. For a thirteen-member Board, and in consideration of the one-man-one-vote requirement of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), Selle determined the normative per-member population to be 2,997. He determined that draw-

4. The reapportionment was necessitated, as the district court found, by substantial shifts in the population distribution in the Parish.

5. Tri-S had extensive reapportionment experience, having worked with over 120 governmental units since about 1968. This included the drawing of reapportionment plans for other parish school boards, various cities and parishes, the taking of special census data, functioning as an expert witness, and work as a court-appointed special master in federal reapportionment cases.

6. It had been Selle's experience, which he communicated to the Board in initial consultations, that less confusion and voter apathy would result if the new plan recapitulated as nearly as possible the geographical pattern and confines of the existing plan. He asserted that drastic changes from an established format often resulted in substantially reduced voter registration figures.

ing a legally acceptable plan would require, if possible, the creation of a black seat on the Board. With these criteria in mind, Selle carved out a substantially black district (1–D) in the northwestern portion of Leesville, having a total population of 3,132, which was 90 percent black (2,823). The evidence does not reflect in meaningful detail how the black population was spread over district 1–D, although it does indicate some concentration of blacks and whites in the south-central portion of the district. Surrounding this "safe" black district was a predominantly white four-member district (districts 1–A, –B, –C, & –E; hereinafter "district 1"), encompassing the remainder of Leesville and a substantial rural area surrounding the town.[7] This four-member district had a total population of 12,226, of whom 1,067 were black, the 1067 being relatively evenly dispersed throughout that district.[8] The other districts in the new plan were geographically similar to the existing districts in the prior twelve-member plan, with moderate relocations of some district boundaries to compensate for the ten-year population shifts and to include the necessary normative population within each district. The final result was a plan consisting of four single-member districts (including 1–D, the "safe" black district), one four-member district, one three-member district, and one two-member district, for a total of thirteen Board members.[9]

Selle admitted on cross-examination that a twelve single-member district plan was possible, as was also evidenced by the existing Parish Police Jury plan. He added that it was impossible, however, to carve out either a second "safe" black district or a second district in which blacks would have a sizable, if nonmajority, proportion of the vote. According to Selle, this result obtained because, notwithstanding the concentration of black population in the Leesville district 1–D area, the remainder of the black population within the parish was geographically scattered.[10] The presence of this "safe" black district ensured that a black member would be elected to the School Board for the first time.[11]

Shortly thereafter, on February 2, 1983, the district court enjoined the scheduled elections until further orders, pending its decision on the merits. On October 13, 1983, while the district court still had the suit under advisement, registered voters in (old) ward 1 of the Parish (covering an area

---

7. In the prior existing plan, this ward 1 area had formed one four-member district. It includes Leesville, and a far larger, rural area surrounding that city.

8. Of these 1,067 blacks, about 325 lived in Leesville (some 192 in an area of town southeast of, but not adjoining, district 1–D, this area being of about the same size as 1–D and also having 910 whites); some 328 were in the "Newllano" area southeast of Leesville; approximately 199 were in "ED 568D" southwest of Leesville; some 113 were apparently in the part of "ED 562" outside and south of Leesville; and some 100 were in "ED 568T" (the location of which is not clear from the record).

9. The racial and ethnic breakdown of the School Board plan is specified in Appendix A. These are all total population, rather than voting age or registered voter, figures. The record does not reflect voting age or registered voter figures.

   There is no evidence of the socio-economic or political characteristics of the "other" (nonwhite, nonblack) group. Census figures (which apparently include military personnel stationed

at Fort Polk) seem to indicate that this group's distribution is in general very roughly similar to that of blacks. The "other" group includes Spanish origin (47 percent), "other" (30 percent), Asian (18 percent), American Indian (5 percent) (percentages are based on totals including military personnel). No point was made below, nor has any been made on this appeal, as to the actual or potential effect of the "other" group in any respect; nor is there sufficient evidence of record to meaningfully assess such effect.

10. Only 1,982 blacks (3,094 minority of all races) populate the Parish districts other than district 1–D. Of these 1,982, by far the largest portion (1,067) is generally distributed over district 1 (*see* note 8, *supra*); the only other relatively sizable "concentration" of blacks is in district 4, a largely rural district south of district 1 (and Leesville), which has only 579 blacks, apparently relatively evenly distributed within that district.

11. One of the appellants, Regionald Seastrunk, was in fact subsequently elected to a position on the Vernon Parish School Board from this district.

similar to new districts 1 and 1–D) sought to intervene. This motion was denied the same day, but the court allowed the petition of intervention and its attachments, including an alternative plan of reapportionment drawn by the Vernon Parish Police Jury (the "Police Jury plan"), to be filed by these individuals as an *amicus* brief.[12]

The Police Jury plan consisted of twelve single-member districts. It, too, provided for one single-member district in substantially black northwest Leesville, including some rural portions of the old ward 1 area surrounding that Leesville district, an arrangement which would also virtually guarantee that a black be elected to the Board. The district court found the Police Jury plan superior in several respects to the Board's plan. In particular, the court expressly determined that: (1) the Police Jury plan was superior with respect to the *Reynolds v. Sims* one-man-one-vote requirement; (2) it was superior also because it did not increase the Board size from twelve to thirteen members, thereby diluting numerically the voting power of the potential black Board member; and (3) it was superior because it consisted entirely of single-member districts. The Police Jury plan had a maximum deviation factor

from the normative per-member population of only 6.3 percent, where the Board's plan showed a maximum deviation of 8.94 percent (district 1–D versus district 2).[13]

The district court found as a matter of fact that, given the present geographical distribution of the minority populations within the Parish, no additional majority black district was possible. It determined that, although the proposed thirteen-member Board plan would numerically dilute the voting strength of individual members of the Board, including that of the prospective black member from the "safe" black district created by the plan, such dilution was not unconstitutional or otherwise illegal. It found that, because of population shifts, the then current plan (that replaced by the "new" plan here at issue) was unconstitutional, and that the evidence established that the new plan, specifically its thirteen-member feature (as contrasted to the twelve members of the former plan and of the Police Jury plan), "was prompted by motives other than racial motives." It noted also that there was no evidence that the right of any individual minority voter in the Parish was "impeded, threatened or denied," and concluded that the evidence, taken as a whole, established that the Board's

12. The PAL plaintiffs offered into evidence an alternative twelve-member "mixed" plan (this had a five-member district, including Leesville and surrounding areas and appearing in most respects to be generally similar to old ward 1, a two-member district, and five single-member districts). Evidence describing it consisted only of a copy of the Board's plan, with superimposed (and slightly differing) district lines drawn in red ink, but without any labeling sufficient to resolve ambiguities in line location; a copy of pertinent census demographic data sheets, but without any further analysis or explanation (the census lines not matching the proposed district lines); and a single typewritten sheet listing the proposed alternative districts and their *total* populations, but without any racial or ethnic breakdowns within district or subdistrict geographical areas (nor were such breakdowns ascertainable from other information on the plan or otherwise in evidence). There was, therefore, insufficient demographic data or analysis submitted to allow the district court to ascertain the merits of this plan, or to assess its viability or possible superiority to the

Board's plan. No testimony was offered in support or explanation of the plan.

We note also that this plan reflected a maximum per-member deviation from the normative value for a twelve-member Board by some 28.9 percent (the PAL "ward 5" had a total population of only 2,308), and on this basis alone, was less desirable in terms of the *Reynolds v. Sims* one-man-one-vote requirement than either the Board or Police Jury plans.

There are no indications in the record that the appellants advocated adoption of the Police Jury plan in lieu of the Board plan.

13. The district court found this maximum deviation to be only 8.4 percent; we cannot ascertain the derivation of this particular value. In this context, we note an arithmetic error in the per-member population of district 2 (2,964 instead of 2,864) in the appropriate document in the record. But this error cannot be the source of the discrepancy: with this "favorable" error, the proper comparison would then have been between district 1–D and "district 5–6–8," yielding an 8.86 percent maximum deviation for the plan.

plan as adopted was neither unconstitutional nor a violation of Voting Rights Act standards. The court recognized that, absent a showing of illegality or unconstitutionality, it owed the Board plan deference as an exercise of legislative policy choice, and that, consequently, it was not free to substitute its own preferences, or plans that might be otherwise "better" than the Board's plan. Thus, although the court had determined the Police Jury plan to be objectively "superior" in several aspects, it declined to order the substitution of the Police Jury plan in favor of the properly enacted School Board plan.

Accordingly, the district court approved the adoption of the Board plan, and set elections for April 7, 1984 (primaries) and May 5, 1984 (general election), with a three-day qualification period for candidates commencing March 8, 1984. Appellants then brought this appeal.

The record indicates that appellants' primary concern in the district court was twofold: First, the increase in Board size from twelve to thirteen members allegedly constituted an impermissible dilution of minority voting power by reducing the voting power of the potential black Board member from one-twelfth to one-thirteenth of the total Board votes. Second, appellants alleged that an only 65 percent black voting majority within district 1–D was sufficient to ensure its "safety" as a black seat on the Board[14]; the "excess" 25 percent of the black population within that district could thus have been put into a second, albeit not "safe," district, giving the black voters of the Parish more leverage in School Board elections.

## STANDARDS OF REVIEW

■ The issues of law raised in this appeal are controlled by the recent decision in *Jones v. City of Lubbock,* 727 F.2d 364,

*reh'g denied,* 730 F.2d 233 (5th Cir.1984). In *Jones,* this Court summarized the history of voting rights cases and voting rights law before *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), through *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), and through congressional action amending the Voting Rights Act in such a way that pre-*Bolden* law was largely codified. 727 F.2d at 376–80. Under the 1982 amendment to section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.,* and under this Circuit's decision in *Jones,* the appropriate standard to employ in determining whether a legislative plan violates the Voting Rights Act is to require that there have been a showing sufficient to justify the conclusion that the proposed scheme results in a *discriminatory* dilution of minority voting power, whether or not the implementing or maintaining governmental body actually intends a discriminatory result.[15]

■ In *Jones v. City of Lubbock,* this Court listed those factors specifically enumerated in the legislative history of the 1982 amendment to section 2 of the Voting Rights Act as "typically" relevant in determining whether a given reapportionment plan or an existing scheme is illegal under that Act. Those factors include: (1) the extent of any history of official discrimination affecting the right of minority group members to register, vote or otherwise participate in the democratic process; (2) the extent to which voting has been racially polarized; (3) the extent to which the political subdivision has employed unusually large election districts, majority vote requirements, anti-single shot provisions or other voting practices that enhanced the opportunity for discrimination; (4) if candidate slating processes were used, whether the members of a minority group have been denied access to that process; (5) the

---

**14.** The evidence indicated that 65 percent black was the approximate minimum black population percentage which the Justice Department would accept as providing a black district for Voting Rights Act clearance purposes. This was thought to normally produce a "Fifty-Fifty voter registration" figure.

**15.** Of course, a showing of intent is relevant to establish discriminatory effect. *See McMillan v. Escambia County, Florida,* 748 F.2d 1037, 1046–47 (5th Cir.1984). Likewise, discriminatory intent of itself will normally render a plan illegal.

extent to which minority citizens bear the effects of discrimination in diverse areas such as education, employment, and health that hinder their ability to participate effectively in the political process; (6) whether past political campaigns have been characterized by overt or subtle racial appeals; and (7) the extent to which members of the minority group have been elected to public office in the past. 727 F.2d at 379. Additional factors "that might have limited relevance" are (a) whether there is a significant lack of responsiveness to minority needs by local officials, and (b) whether the policy underlying the political subdivisions' use of voting qualification prerequisites is tenuously based. *Id.*[16] Considering the relevant factors, a determination is to be made on the basis of the totality of the circumstances. *McCarty v. Henson,* 749 F.2d 1134, 1137 (5th Cir.1984).

■ By contrast, to establish the *unconstitutionality* of a voting scheme, a complainant must show by direct or indirect evidence that there exists a purposeful intent to discriminate on the part of the enacting legislative body. *Bolden,* 446 U.S. at 62, 66, 100 S.Ct. at 1497, 1499; *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971); *McCarty v. Henson,* 749 F.2d at 1136; *Jones,* 727 F.2d at 377–78. That intent may take the form of the introduction of an intentionally discriminatory practice, or the mere adherence to existing practices with the intent to maintain a discriminatory system. *Bolden,* 446 U.S. at 62, 100 S.Ct. at 1497; *Lodge v. Buxton,* 639 F.2d 1358,

1363 (5th Cir.1981). A direct showing of subjective intent is not necessary; objective indicia may be used to show the existence of a discriminatory purpose. *Rogers v. Lodge,* 458 U.S. 613, 622–27, 102 S.Ct. 3272, 3278–81, 73 L.Ed.2d 1012 (1982); *McCarty v. Henson,* 749 F.2d at 1136; *Jones,* 727 F.2d at 376–378.

■ At-large plans are not *per se* illegal. *Bolden,* 446 U.S. at 66, 100 S.Ct. at 1499; *White v. Regester,* 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. at 156–60, 91 S.Ct. at 1875–78; *McCarty v. Henson, supra.*

■ We note also that, in legislative apportionment plans, maximum district population deviations from normative values that are less than ten percent generally qualify a plan as *prima facie* constitutional, a rule of thumb of which the district court was aware. *See, e.g., Connor v. Finch,* 431 U.S. 407, 417–18, 97 S.Ct. 1828, 1835–36, 52 L.Ed.2d 465 (1977) (variations of 16.5 percent and 19.3 percent violate equal protection; under ten percent variation establishes *prima facie* constitutional validity "only in the context of legislatively enacted apportionments"); *Gaffney v. Cummings,* 412 U.S. 735, 739–41, 93 S.Ct. 2321, 2324–25, 37 L.Ed.2d 298 (1973) (7.83 percent in legislative plan); *White v. Regester,* 412 U.S. at 764, 93 S.Ct. at 2338 (9.9 percent in legislative plan); *cf. Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1156, 1159 (5th Cir.1981) (4.11 percent

---

**16.** The factors outlined in *Jones* are essentially those previously employed by this Court in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). The Supreme Court plurality in *Bolden* had initially rejected the *Zimmer* factors as having any meaningful use in assessing intent to discriminate. 446 U.S. at 72–74, 100 S.Ct. at 1502–1503. Only two years later, however, in *Rogers v. Lodge,* the Court affirmed the invalidation of an at-large system based on evidence and analysis largely derived from the *Zimmer* factors and indicia. 458 U.S. at 621–31, 102 S.Ct. at 3277–3283. We stated in *Jones:*

"Clearly, *Zimmer* and *White* [*v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) ] inspired both the language of the statute and the legislative explanation of its meaning. Moreover, the statute aims at ensuring continuity with prior law.... Congress unequivocally expressed its understanding that pre-*Bolden* law evaluated the discriminatory nature of election systems solely on the basis of objective criteria. [Citations omitted.]

"Congress has made clear its understanding that a court under section 2 should apply *White* and *Zimmer* as purely 'results' cases." 727 F.2d at 379 (footnote omitted).

deviation in court-ordered plan sufficiently *de minimus* ).

## JUDICIAL DEFERENCE

■ It is the legislature's function to make decisions of basic political policy. Thus, even where a legislative choice of policy is perceived to have been unwise, or simply not the optimum choice, absent a choice that is either unconstitutional or otherwise illegal under federal law, federal courts must defer to that legislative judgment. *Upham v. Seamon,* 456 U.S. 37, 40, 102 S.Ct. 1518, 1520, 71 L.Ed.2d 725 (1982); *Jones,* 727 F.2d at 374; *see also McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 341, 4 L.Ed. 579 (1819); *McDaniel v. Sanchez,* 452 U.S. 130, 139–40, 101 S.Ct. 2224, 2230–31, 68 L.Ed.2d 724 (1981); *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), *Burns v. Richardson,* 384 U.S. 73, 85, 86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966); *Reynolds v. Sims,* 377 U.S. at 586, 84 S.Ct. at 1394. In *Upham,* the Supreme Court again reiterated this standard of judicial deference to constitutionally permissible determinations of policy and reapportionment by the states. The Court stated expressly that "in the absence of any finding of a constitutional or statutory violation ... a court must defer to the legislative judgment the plan[ ] reflect[s]," and that, where the Justice Department has offered no objections following a preclearance submission under section 5 of the Voting Rights Act, a federal court is not free to substitute its reapportionment preferences for those of the state. *Id.,* 456 U.S. at 40–41, 102 S.Ct. at 1520–21.

■ This is not a case involving a court-ordered plan, where equitable considerations demand a close scrutiny and mandate the fashioning of a near-optimal apportionment plan. *See, e.g., Bolden,* 446 U.S. at 66 n. 12, 100 S.Ct. at 1499 n. 12; *Connor v. Finch,* 431 U.S. at 415, 97 S.Ct. at 1834; *Chapman v. Meier,* 420 U.S. 1, 26–27, 95 S.Ct. 751, 765–66, 42 L.Ed.2d 766 (1975). Instead, the district court was asked to find unconstitutional or otherwise illegal a plan drawn by the body duly authorized by state law to effect a reapportionment. Under the *Wise v. Lipscomb* standard, the federal district court is precluded from substituting even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan that has been proposed and enacted by the appropriate state governmental unit. "The only limits on judicial deference to state apportionment policy ... [are] the substantive constitutional and statutory standards to which such state plans are subject." *Upham,* 456 U.S. at 42, 102 S.Ct. at 1521 (citing *White v. Wiser,* 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1973)).

## NO SECOND "SAFE" OR MORE BLACK–ORIENTED DISTRICT

■ We review the district court's findings of fact under the clearly erroneous standard. *Rogers v. Lodge,* 458 U.S. at 622–23, 102 S.Ct. at 3278–79; *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Jones v. City of Lubbock,* 727 F.2d at 371; Fed.R.Civ.P. 52(a). In particular, we conclude that the district court's findings that the School Board was not actuated by a racially discriminatory motive and that no plan could be drawn that would include more than one "safe" majority black district are amply supported by evidence in the record.

Selle's testimony was to the effect that it would be impossible to draw district boundary lines in such a way that either a second "safe" black district, or a second district with a significant black population, could be created. He was questioned at length concerning both the method of his determination of the plan boundaries ultimately proposed to the Board, and of the constraints and imperatives under which he felt he was operating. His testimony reflected a thorough knowledge of local demographics and of the legal constraints applicable to the task. He was questioned extensively concerning possible alternatives that might enhance black voting power in the Parish, beyond those inherent in the plan as proposed. His unshakable opin-

ion was that significant enhancement was impossible, given the rather homogeneous distribution of the remainder of the Parish black population outside the "safe" district included in the Board's plan. He did indicate that it might have been possible to draw the boundaries in such a way as to produce two adjacent districts with substantial but *nonmajority* black populations, a result that would have sacrificed a certain black position on the Board for an uncertain black influence in two members' election. Selle felt that a "safe" black district was preferable.[17] We see no occasion to disagree, particularly as appellants do not contend that a plan without any "safe" black district, but having two (or more) districts with substantial black minorities, is preferable to the plan approved.

Appellants' cross-examination of Selle provided no basis for doubting his referenced conclusions. He indicated that, in discussions with the Board, "they preferred to maintain pretty much, as much as possible, the [geographical] format they had." He indicated that his preliminary research had revealed that no black had been elected to the Board at least since the 1920's. Aware of the need, therefore, to include a black member on the Board,[18] and, given the constraints of a thirteen-member composition preferred by the incumbent Board, he drew the plan at issue as the best representation of the results desired with the constraints imposed. Selle did admit that he essentially carved out the safe district as a new (thirteenth) Board member's place, and readjusted other existing boundary lines so as to make up the required normative district populations around that safe district. There was no evidence that any other approach could have produced a thirteen-member plan more favorable to black voters.

Appellants offered no testimony of their own, by expert or lay witnesses, to discredit or cast doubt on Selle's account or opinions. They offered no evidence indicating that a second "safe" or even "influential" black district could be drawn.[19] To be sure, appellants did offer into evidence a plan of their own; but it was, as we have already indicated, wholly inadequate because of the lack of racial and other detailed demographic data with which the court might assess its viability and/or superiority as compared to the Board's plan. The record affords no basis for concluding that appellants' plan would likely provide either two "safe" black districts or one "safe" black district, plus other districts where blacks, though in a minority position, would on the whole be more influential than in the white majority districts of the Board's plan. And, as we have also noted, the appellants' plan showed an unacceptably large percentile departure from

17. La.–R.S. 17:71.3(B) requires that "special school board election districts" be "compact and contiguous." Although Selle did not at any point cast his conclusion that noncontiguous districts were not acceptable in these terms explicitly, nor ever referred to this legal constraint expressly, appellants questioned him in detail regarding the possibility of such extreme gerrymandering or "alleying"—including even the possibility of using noncontiguous districts—to accomplish the construction of a second "safe" or influential black district. In response, Selle indicated that he thought such a plan might violate state law, but he was not sure; he had had no reason to explore such an approach, in any event, presumably because, as he testified, he felt the Board's plan to be constitutionally and legally acceptable. He did note that, "There are no contiguous locations of density of population of minorit[ies] to provide anything greater than one basic black district in the Parish."

18. Selle clearly felt that such a "safe" black district would be required in order to obtain preclearance approval of any plan by the Justice Department.

19. Selle also indicated that he had been present for questioning by and input from the public, including members of the PAL, about the plan, or for them to express their concerns, at several public Board meetings at which the plan was discussed. He asserted that he had informed those members of the public attending such meetings, including on several occasions appellant Regionald Seastrunk, that he would make himself available for more detailed discussions upon request, but that, beyond perhaps one or two telephone conversations with Seastrunk, no detailed expressions of black/PAL concerns were made to him. Nor were serious and viable alternatives presented to him by any members of the black community.

the per-member normative population required for each district. In sum, there simply was nothing in the record, either introduced as documentary evidence, established by testimony at the hearing by appellants, or elicited during the extensive cross-examination of Selle, that would form even a remote objective basis to conclude other than that what Selle represented to be true was in fact true. The district court's conclusion that no second "safe" black district could be drawn was, therefore, not clearly erroneous, and must stand. Further, there is no sufficient evidence to support the claim that more of the white majority districts might reasonably be drawn to have more influential black minorities than under the Board's plan.

## THE SCHOOL BOARD REAPPORTION-MENT PLAN

Appellants also complain that the Board's decision to add a thirteenth member to the then existing twelve-member Board diluted the power of any potential minority member on the Board.

### A. A "Better" Plan?

The district court found that, notwithstanding its perception of the superiority on general grounds of the alternative plan adopted by the Police Jury, the Board's plan was "not impermissible and not unconstitutional." Nor was it the product of any racially discriminatory motive. Consequently, the district court approved the Board's plan.

■ The language of the Voting Rights Act itself provides expressly that, although the Act is intended to discourage discrimination against minority groups with respect to their opportunity for *participation* in the electoral process, it does not purport to guarantee or to compel minority representation in publicly elected bodies that is proportional to the racial makeup of the political unit: "Nothing in this section establishes a right to have the members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b) (West Supp.1982). Nor

has any equal protection analysis ever imposed such a guarantee of electoral success.

■ Appellants' conclusory assertions that a better plan might have been drawn do not meet the burden of proof of illegality outlined by Congress and applied by this Court in *Jones.* Selle's testimony, amply supported by objective statistical data, established, first, that a second "safe" black district was impossible because of the widespread and homogeneous geographical distribution of the remaining black population in the Parish; and, second, that it was impossible to compose a second district having a substantial black influence, even by utilizing some of district 1–D's "excess" black population. These points were unrebutted by any testimony or documentary evidence.

Testimony by appellant Seastrunk did indicate that a few of the *Zimmer* Voting Rights Act factors were present: That the Parish had a history of overt discrimination could be inferred from the historical absence of any black Board member; in fact, no black had ever held office of any sort in the Parish. The existence of a primary system may have worked to the detriment of blacks achieving success in being elected to public office. But there was no evidence to indicate the presence of any other of the relevant factors. In particular, there was no evidence that any black had recently been prevented from voting or otherwise participating in the electoral processes of the Parish. There was no evidence of candidate slating from which blacks were excluded, nor of polarized voting patterns, majority voting requirements, exceptionally large election districts, or any other such contrivances to dilute or degrade the voting power of Parish blacks. There was no indication that recent discrimination was practiced in areas such as education, employment or health, which might have reduced the ability of blacks to participate effectively in the electoral processes of the Parish. Nor were there indications that recent elections had been at all characterized by overt or subtle racial overtones, or

that local officials had been unresponsive to local black needs. There was no evidence that any unusual voting qualification prerequisites were imposed.[20] The district court found expressly that there was no evidence that the voting rights of any black resident of the Parish were in any way "impeded, threatened or denied"; a result which, on this record and under a totality of the circumstances test, is sound. The record here reveals no impermissible deficiency in the boundaries of the Board plan.

## B. The Dilution Claim

■■ Appellant Seastrunk's testimony establishes that the major, if not sole, ground for appellants' objections to the Board plan were that an unspecified "better" plan could have been drawn and that appellants preferred a plan different than that adopted by the School Board. Though there was no admission directly by the parties, appellants made the strong suggestion, and both parties explored the question, whether the School Board chose to go from a twelve-member to a thirteen-member Board in order to avoid any of the incumbents necessarily having to lose their seat in the upcoming election. While this may not reflect a very laudable or altruistic motive on the part of incumbent Board members, it is not facially or *per se* a discriminatory one.

Appellants simply have made no sufficient testimonial or documentary showing that would justify an inference that the Board acted with discriminatory intent when it chose to adopt a thirteen-member apportionment plan. The district court properly found there was no such intent. Nor were there any facts in the record to show that the Board plan in any way denied any black member of the Parish voting population *access* to the political processes

of the Parish school government. The district court properly found there was no such denial. Appellants' unsupported complaint was only that a differently drawn plan *might* result in the Parish blacks achieving a yet greater success in electing members to the Board than was afforded by the single "safe" black district.

As we have previously noted, however, neither the Constitution nor the Voting Rights Act purport to guarantee minority *success* at the polls. The Voting Rights Act requires that "the political processes leading to nomination or election" be *"equally open to participation"* by minorities and that minorities not have "less *opportunity* than other[s] ... to participate in the political processes and to elect representatives of their choice." 42 U.S.C. § 1973(b) (emphasis added). But it does not grant the right to proportional minority elected representation as such, though the extent of minority electoral success is "one circumstance that may be considered." *Id.* To be sure, an "opportunity" may be rendered meaningless except in form, where the voting scheme is effectively arranged in such a way that otherwise normally available possibilities for realistic minority success at the polls are precluded. But we are not here faced with such a situation.

Considering the relative proportion of the black population in comparison to the whole, the blacks of the Parish would be entitled to only 12.4 percent of the seats on any Board. For a twelve- or thirteen-member Board, this is only one seat. To be entitled to two seats, the black population would need to be at least 16⅔ percent (twelve-member Board) or 15.4 percent (thirteen-member Board). With the present proportion of black population in the Parish, the Board would need to be at least of sixteen-member size to afford a second

---

**20.** Nor was there evidence that any candidacy requirements were imposed that might have had a disparate effect upon the qualification of black candidates for public office. There is a state law requirement that school board members be able to read and write, La.–R.S. 17:52(D), be eighteen years of age, have resided in the state for two years, and be a domiciliary of the parish, ward or district from which he seeks election. La.–R.S. 17:52(E). There was no evidence that these requirements adversely affected the number of black candidates.

black seat.[21] The test is not for the superiority of an alternative plan, but whether the legislative choice passes muster. Thus, even the existence of the objectively superior Police Jury plan, standing alone, is insufficient as a basis to find that the Board plan was not constitutionally or legally permissible. This is true whether the legislative plan fails to reflect the preferences of the minorities or of the court. The requirement that courts show deference to legislative policy decisions means that a federal court is precluded from substituting a plan that is perceived only to be "better."

■ Here, the extent of effective dilution [22] of member voting power relevant to the prospective black seat is sufficiently minimal that, without more, it will not justify—let alone compel—a finding that the Board plan violates the Constitution or the Voting Rights Act. Absent a showing that a *qualitatively* [23] superior choice of districts was practicable—that is, in this context, that there was any realistic possibility of a second black member's being elected to the Board or of overall significantly greater black influence in white majority districts under a different choice of district boundaries [24]—or that the increase in Board size was effected with the purposeful intent to reduce minority voting strength on the Board, we view this small numerical dilution of Board member voting power as *de minimus*. Nothing in the evidence or in common experience suggests that a single black representative on a thirteen-person board is *any* less effective than a single black representative on a twelve-person board. We conclude, therefore, as did the district court, that the Board plan as drawn did not impermissibly dilute the voting power of blacks in the Parish.

In *Cook v. Luckett,* 735 F.2d 912 (5th Cir.1984), this Court considered the reapportionment scheme proposed by the Madison County, Mississippi county supervisors, which involved district lines that "were more than just odd" and "respond[ed] poorly to commonly understood policies that govern apportionment planning." *Id.* at 920. Recognizing that the county plan had a population variance among the districts that was satisfactory to the Constitution, and that the plan had been precleared under section 5 of the Voting Rights Act, this Court approved it and noted that

"[w]hile the maps depicting its result may seem odd, Madison County's political process involved just the sort of give-and-take between citizens and their elected officials that federal courts are unable

21. This size is precluded by state law, which sets a fifteen-member limit on the size of parish school boards. La.-R.S. 17:71.1(A).

22. The change from a 1/12 share (8.333 percent) of relative voting power in a twelve-member Board, to that proportionate share of a member in a thirteen-member composition (1/13, or 7.692 percent), implies a change in the relative voting power of a member that is equal to only 0.641 of one percentage point (otherwise stated, the black fraction of a thirteen-person board would be 92.3 percent of the black fraction of a twelve-person board).

23. At some point, as the normative measure of the dilution increases, what may be characterized as merely a quantitative difference may become significant enough to be effectively a qualitative difference, so that it can no longer be considered a *de minimus* effect. Of necessity, determining precisely where a quantitative defect passes this qualitative threshold involves a difficult and subjective line drawing. It is

precisely this kind of judgment that has resulted in the "ten percent" line denominated as acceptable for deviations from the normative per-member population in legislatively drawn reapportionment plans.

24. Our discussion of the contentions respecting maximizing black concentration in one or more white majority districts is not intended to imply a right on the part of black voters to have districts "gerrymandered" in such a fashion as to enhance black political strength *beyond* the level required by the Constitution or the Voting Rights Act. That black political power under one set of political arrangements is less than it might be under another does not, of itself, necessarily establish that the former arrangements violate the Constitution or the Voting Rights Act. We doubt, for example, that where blacks are forty percent of the relevant population, they would necessarily be entitled to a configuration of districts that would likely give them sixty percent of the elected representatives, even if this were feasible by careful gerrymandering.

to achieve. Unless a showing is made to render that give-and-take somehow suspect, we must acknowledge that process as the proper means toward the essentially political end of reapportionment." 735 F.2d at 918–19.

We also held that a federal court may reject a properly proposed legislative scheme only to the extent necessary to correct specific deficiencies found to exist, and that questions of policy were reserved for legislative resolution. Certainly the contrived plan proposed by Madison County officials in *Cook* constitutes an even more extreme example of what might arguably be termed a self-interested legislative reapportionment than does the Vernon Parish School Board's instant thirteen-member plan.

## CONCLUSION

Appellants complain that a better reapportionment plan might be available, although they proposed no such plan. They alleged no facts and offered no proof that the School Board plan violates the one-man-one-vote requirement, or that it results in the denial to any black voter of access to School Board political processes or of equal opportunity to elect representatives. The effect of the dilution of Board member voting power by the increase in size of the Board is *de minimus* and without practical significance. There was no showing that the Board adopted the plan with any intent to discriminate. The bare assertion that a more suitable plan was possible is insufficient to establish such an intent or effect. The evidence in this record is simply insufficient to justify—much less compel—a conclusion that the Board's plan is unconstitutional or that it violates the Voting Rights Act. Absent such facts, federal courts are without authority to overturn a validly drawn legislative apportionment plan, regardless of its general wisdom or desirability. Consequently, we affirm the judgment of the district court.

AFFIRMED.

## APPENDIX A

The new plan, with a normative per-member population of 2,997, showed the following ethnic and racial population breakdowns:

| District | Total Population | White | Black | Other | % White | % Black | % Other | % Normative Deviation |
|---|---|---|---|---|---|---|---|---|
| 1 (4)[a] | 12226 (3056.5)[b] | 10426 | 1067 | 733 | 85 | 9 | 6 | 1.99 |
| 1–D | 3132 | 309 | 2823 | 0 | 10 | 90 | 0 | 4.50 |
| 2 (2)[a] | 5728 (2864)[b] | 5538 | 120 | 70 | 97 | 2 | 1 | (4.44) |
| 3 | 3010 | 2888 | 103 | 19 | 96 | 3 | 1 | 0.43 |
| 4 | 3082 | 2307 | 579 | 196 | 75 | 19 | 6 | 2.84 |
| 5,6,8[c] (3)[a] | 8599 (2866.3)[b] | 8506 | 65 | 28 | 99 | 1 | 0 | (4.36) |
| 7 | 3120 | 3006 | 48 | 66 | 96 | 1.5 | 2.5 | 4.10 |

[a] Number of Board members representing multi-member district.

[b] Average per-member population.

[c] Large rural district covering eastern half of Parish and including Fort Polk military reservation lands, with Board Member residence requirement: one Board member from each of districts 5, 6, and 8, each elected by vote of all districts 5, 6, and 8 voters.